IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

JAYSON K. BROWN, INDIVIDUALLY
AND AS A REPRESENTATIVE OF A
CLASS OF PARTICIPANTS AND
BENEFICIARIES ON BEHALF OF THE
PECO FOODS, INC. RETIREMENT
SAVINGS PLAN                                                                              PLAINTIFFS

VS.                                                                  CIVIL ACTION NO. 3:25-cv-491-TSL-RPM

PECO FOODS, INC. AND JOHN DOES
1-10, INCLUSIVE                                                                           DEFENDANTS

### DEFENDANT PECO FOODS, INC.'S REBUTTAL IN SUPPORT OF ITS MOTION TO DISMISS

Defendant Peco Foods, Inc. ("Peco") respectfully submits this Rebuttal in Support of its Motion to Dismiss Plaintiff's Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

### I.  INTRODUCTION

Plaintiff's Response [Docs. 14 & 15] underscores that every claim asserted in the Complaint depends on rewriting the Plan's discretionary word "may" into a mandatory "must." However, contrary to Plaintiff's position, ERISA does not allow participants to manufacture obligations the Plan never imposed. The governing documents of the Peco Plan are clear: the administrator **may** apply forfeitures to expenses, contributions, **or** reallocations. Plaintiff's theory ignores this permissive language. When the Court applies the controlling Fifth Circuit standard—enforcing the Plan as written—all five claims fail as a matter of law.

04747886

Plaintiff's standing theory fares no better; but even if Plaintiff satisfied Article III, the Complaint still does not state a plausible claim under Rule 12(b)(6). The Court should therefore dismiss the Complaint with prejudice.

## II.    BACKGROUND: WHAT THE PLAN AND THE SPD ACTUALLY SAY

In its Motion and initial Memorandum [Docs. 10 & 11], Peco attached and quoted both the governing Plan document and the SPD. Section 3.05 of the Plan provides that forfeitures "**may** first be used to pay administrative expenses. Remaining Forfeitures, if any, **may** then be used to reduce Employer Contributions (other than Elective Deferral Contributions) …." [Doc. 10-1 § 3.05 (pp. 28-29) (emphasis added)]. The SPD likewise confirms that Peco "**may** use forfeitures to pay plan expenses, offset our next contributions, **or** reallocate the amounts to participant accounts." [Doc. 10-2 at 12 (emphasis added)]. The operative verb is "may," and the SPD's disjunctive "or" confirms that the administrator has options—not an absolute duty to exhaust forfeitures on plan expenses before using them for any other purpose.

## III.    LEGAL ARGUMENT

**A.    Count I Fails: The Plan's Text Confers Discretion; It Does Not Impose a Mandatory "Use-For-Expenses First" Policy.**

Courts routinely hold that "may" confers discretion. *See, e.g., Anderson v. City of McComb*, No. 3:10-CV-617TSL–MTP, 2012 WL 1344025, at *7 (S.D. Miss. Apr. 16, 2012) (distinguishing between permissive word "may" and mandatory word "shall"). Plaintiff's construction flies in the face of this principle and (1) converts "may" into "must," (2) reads the "may-then" clause in Section 3.05 as surplusage, and (3) conflicts with the SPD's inclusion of the disjunctive word "or." On the other hand, Peco's reading of the Plan and the SPD gives effect to *all* words in these documents and consequentially supports only one reasonable interpretation: Section 3.05 sets out *permissible* uses and a sequence to follow when the administrator elects

among them; it does not require forfeiture exhaustion on expenses in every year regardless of context.

Not only is Peco's interpretation supported by the language of both Plan documents, but also the Plan itself expressly vests the administrator with discretionary authority to interpret and apply the Plan's provisions. Article IX confirms that the administrator is empowered with (1) "complete control of the administration of the Plan" including "complete discretion to construe or interpret the provisions of the Plan," and (2) authority to "make any and all factual determinations and interpret all terms and provisions of the Plan documents relevant to the issue under consideration." [Doc. 10-1 § 9.01 (p. 84) & 9.07 (p. 89)]. Courts consistently defer to such discretionary determinations if they are reasonable and consistent with the plan's language. *See Vercher v. Alexander & Alexander Inc.*, 379 F.3d 222, 226 (5th Cir. 2004) (noting that where plan expressly gives administrator discretionary authority to determine meaning of plan terms, court should only override authority if administrator abused its discretion).

Thus, even if Plaintiff's strained reading of Section 3.05 was plausible, the administrator's contrary interpretation—that forfeitures may be used for expenses, contributions, or reallocations in the order and amounts deemed appropriate—is entitled to deference absent an abuse of discretion. Simply put, the Court should bar Plaintiff from converting his mere disagreement with the administrator's discretionary authority into unfounded fiduciary-breach or prohibited-transaction claims.

1.     **Plaintiff's Sequencing Theory Distorts the Plain Grammar of Section 3.05.**

Plaintiff focuses narrowly on the words "first … then" in Section 3.05 while overlooking the operative verb that governs the provision. Read naturally, Section 3.05 provides: (i) the fiduciary *may* elect to use forfeitures on expenses; and (ii) if any forfeitures remain after that

*elected* application, the fiduciary *may then* use the remainder to reduce Peco's contributions. That reading is worlds apart from "must use forfeitures to fully cover expenses to zero before any other use" as Plaintiffs would have it.

### 2. The SPD Confirms That Forfeitures May Be Applied in the Alternative.

Despite Peco's discussion of the operative language in the SPD in its initial brief, Plaintiff fails to even mention the SPD in his Response. Plaintiff's silence on the SPD is telling. The SPD is ERISA's "statutory plain-language mechanism" for informing participants of their rights. *Hicks v. Fleming Cos., Inc.*, 961 F.2d 537, 539 (5th Cir. 1992). Courts consistently construe plan terms in light of the SPD. *See Koehler v. Aetna Health Inc.*, 683 F.3d 182, 188–89 (5th Cir. 2012).

In a recent decision by the United States District Court for the Southern District of Texas, the court explained the importance of the SPD in explaining to a participant his or her rights under an ERISA plan:

> Under ERISA § 102(a), summary plan descriptions must be "written in a manner calculated to be understood by the average plan participant" and must be "sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a). As such, courts interpret plan summaries from the perspective of a layperson. *Koehler v. Aetna Health Inc.*, 683 F.3d 182, 188 (5th Cir. 2012); *Harris Methodist Ft. Worth v. Sales Support Servs. Inc. Emp. Health Care Plan*, 426 F.3d 330, 336 (5th Cir. 2005).

*Pedersen v. Kinder Morgan Inc.*, 742 F. Supp. 3d 725, 746 (S.D. Tex. 2024).

Here, the SPD plainly states that forfeitures "may" be used to pay expenses, offset contributions, or be reallocated—again confirming discretion rather than a mandatory exhaustion rule. [Doc. 10-2 at 12]. It is implausible that a layperson could interpret it any other way. Moreover, Plaintiff cites no language the SPD that imposes a mandatory order on the reallocation of forfeitures, and by failing even to acknowledge the SPD's clear disjunctive phrasing, Plaintiff effectively concedes that this summary document undermines his position.

### 3. *Walsh* and Similar Cases Are Distinguishable.

Plaintiff's reliance on *Walsh v. Allen* and similar out-of-circuit decisions, (*see* Doc. 15 at 15-16), is misplaced because those cases turned on materially different language. For example, in *Walsh*, the disputed provision stated: "Forfeitures **will** be used to pay Plan expenses" before application for other purposes. *Walsh v. Allen*, No. 3:17-cv-784-BJB, 2022 WL 256312, at *1 (W.D. Ky. Jan. 16, 2022) (emphasis added). The court concluded that the word "will" was mandatory and left no discretion to the plan administrator. *Id.* at *5. Additionally, the court correctly recognized the distinction between the words "will" and "may" in the context of applying forfeitures:

> The defendants' interpretation fails for another reason: it would render the plan documents' distinction between "may" and "will" meaningless. As noted above, courts have recognized that the meaning of "will" depends on context…. Elsewhere, the plan documents use "may" in a distinct way to indicate permissive language. Section 7.11 (emphases added) states:
>
> The Employer *may* elect in AA § 8-8 how it wishes to allocate forfeitures under the Plan. Forfeitures *may* be used in the Plan Year in which the forfeitures occur or in the Plan Year following the Plan Year in which the forfeitures occur. In applying the forfeiture provisions under the Plan, if there are any unused forfeitures as of the end of the Plan Year designed in AA § 8-8(c) or (d), as applicable, any remaining forfeiture *will* be used (as designated in AA § 8-8) in the immediately following Plan Year….
>
> This describes the choices available to [the employer] before—not after—it designed its Adoption Agreement. **The plan consistently uses "may" where employers have a choice and "will" when only one option exists**…. And the discerning uses of these words—in the very section that explains how the § 8-8 election works—suggests that "will" continues to have mandatory effect in that section.

*Id.* at *5 (emphasis added) (internal citations omitted).

Unlike the provision at issue in *Walsh*, the Plan here expressly states that forfeitures "may" first be applied to administrative expenses, and any remaining forfeitures "may" then be used to reduce employer contributions. The SPD reinforces this discretionary framework, explaining that forfeitures "may" be used to pay expenses, offset contributions, or be reallocated to participant accounts. Thus, rather than aiding Plaintiff, *Walsh* underscores that the governing documents here contain permissive—not mandatory—language.

*Walsh* is also distinguishable because it involved a pre-approved IRS "adoption agreement," which required employers to elect among check-the-box options. *Walsh,* 2022 WL 256312, at *1. The court emphasized that because the employer had expressly checked the option that forfeitures "will" be used for expenses, it had bound itself to that mandatory choice. *Id.* Here, Peco's Plan is not a modular adoption agreement but instead is an integrated Plan and SPD that are drafted to vest discretion in the administrator. Plaintiff cannot import *Walsh*'s reasoning to rewrite discretionary provisions into mandatory ones.

*Stewart v. Nextera Energy, Inc.*, No. 23-81314 (S.D. Fla. Aug. 14, 2025) likewise does not help Plaintiff's cause. In *Stewart*, the plan contained a provision stating that forfeitures **"shall"** be applied in a specific order: (i) restore amounts, (ii) reduce Plan administrative expenses, and (iii) reduce Company contributions. That is a mandatory hierarchy. By contrast, Peco's Plan provides that forfeitures **"may"** be used to pay expenses, offset contributions, or reallocate to accounts. The use of "may" instead of "shall" is dispositive; it confers discretion rather than imposing a rigid order.

### 4.   *"Good Faith and Fair Dealing"* and *Contra Proferentem* Cannot Rewrite ERISA Plan Terms.

Plaintiff's reliance on Mississippi contract doctrines such as "good faith and fair dealing" and *contra proferentem* is misplaced. ERISA plans are construed under federal common law, which requires courts to enforce the written terms of the plan as drafted. *See Heimeshoff v. Hartford Life & Accident Ins. Co.*, 571 U.S. 99, 100 (2013) ("The principle that contractual limitations provisions ordinarily should be enforced as written is especially appropriate when enforcing an ERISA plan."); *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 147–48 (2001) (reinforcing that state law rules which "relate to" plan administration are preempted by ERISA).

The Fifth Circuit has squarely rejected Plaintiff's approach. Where a plan vests the administrator with discretionary authority, state-law doctrines like *contra proferentem* have no role in plan interpretation. *High v. E-Systems, Inc.*, 459 F.3d 573, 578-79 (5th Cir. 2006). Courts likewise refuse to graft implied state-law duties of "good faith" or "fair dealing" onto ERISA plans, as doing so would contravene ERISA's command that fiduciaries act "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D).[1]

Here, Section 3.05 of the Plan gives the administrator discretion to use forfeitures in specific ways. Plaintiff's proposed "expenses-first" rule would improperly alter that unambiguous

---

[1] *See Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d 262, 276 (5th Cir. 2004) (holding that state common law claim for breach of duty of good faith and fair dealing was preempted by ERISA because it did not regulate insurance within the meaning of ERISA's savings clause and conflicted with ERISA's comprehensive regulatory scheme); *Brewer v. Lincoln Nat'l Life Ins. Co*., 921 F.2d 150, 153-54 (8th Cir. 1990), *cert. denied*, 501 U.S. 1238 (concluding that state law rule of construction violated provisions of ERISA and could not be used to interpret plan's terms); *McMahan v. New England Mut. Life Ins. Co*., 888 F.2d 426, 429-30 (6th Cir. 1989) (holding state law breach of contract claim was preempted by ERISA because "applying Kentucky contract law to disputed benefits claims could potentially subject [administrator] to inconsistent obligations under the laws of various states").

provision. The Court should reject Plaintiff's attempt to rewrite the Plan by importing state-law doctrines foreclosed under ERISA.

B.     **Counts II & III Fail: No Plausible Breach of Loyalty or Prudence Where the Fiduciary Adhered to the Plan's Discretionary Framework.**

Plaintiff's theory essentially equates reduced future contributions by the employer when forfeitures are used internally with disloyalty. That is not the law. Using plan-held forfeitures within the Plan's authorized framework does not convert standard, internal plan accounting into "self-dealing." As discussed in Peco's initial Memorandum, numerous courts addressing similar allegations have rejected disloyalty claims where the plan expressly authorized the forfeiture uses. *See* Doc. 11 at 9-11.

   1.   ***Bussian* Does Not Apply: It Was a Disclosure and Due Diligence Case, Not a Plan-Interpretation Case.**

Plaintiff's heavy reliance on *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286 (5th Cir. 2000) is misplaced. That case arose from an employer's decision to terminate a defined benefit pension plan and purchase a single-premium annuity from Executive Life, an insurer whose portfolio was heavily concentrated in junk bonds. *Id.* at 289. The Fifth Circuit held that fact disputes existed over whether the plan fiduciary had conducted an adequate investigation into annuity providers, especially given evidence that cost considerations and the sponsor's interest in recapturing surplus assets may have influenced the selection. *Id.* at 299-300.

This case is entirely different. First, *Bussian* involved a plan termination and annuity purchase, circumstances that inherently raise heightened fiduciary concerns because participants' promised benefits depend on the solvency and financial health of a third-party insurer. Here, by contrast, there is no plan termination, no annuity purchase, and no reversion of surplus assets.

Instead, the challenged conduct involves the administrator's routine allocation of forfeitures under the Plan, governed by explicit plan language.

Second, *Bussian* turned on whether the fiduciaries satisfied their duties of prudence and loyalty by conducting a "careful and impartial investigation" before selecting an annuity provider. *Id.* at 300. Plaintiff here points to no analogous investigative duty; the administrator simply applied Section 3.05 of the Plan as written. No dispute exists regarding the safety of investments, conflicts of interest, or hidden risks—only Plaintiff's attempt to impose an "expenses-first" rule not found in the Plan.

Finally, far from supporting Plaintiff's position, *Bussian* underscores that ERISA fiduciary duties are context specific. The Fifth Circuit stressed that fiduciaries must act "with an eye single to the interests of participants and beneficiaries" in the unique circumstances of plan termination. *Id.* at 298. That standard does not empower courts to override clear and unambiguous plan terms in ordinary plan administration.

In short, *Bussian* is a case about failed due diligence in a high-stakes annuity selection. This case is about faithfully applying unambiguous plan terms. The Court should reject Plaintiff's attempt to stretch *Bussian* as authority to rewrite ERISA plans.

### 2. The Complaint Does Not Allege a Plausible Prudence Claim.

As to Plaintiff's claim for breach of the duty of prudence, the Complaint recites outcomes (how forfeitures and expenses were applied) but does not plausibly allege a deficient process. ERISA prudence focuses on process, not results. *See Pizarro v. Home Depot, Inc.*, 111 F.4th 1165, 1173 ("The inquiry centers not on the results of an investment, but on a fiduciary's process for choosing that investment."). And ERISA does not impose a duty to maximize participant balances

beyond what the Plan promises or to pay expenses out of the employer's pocket. *Hutchins v. HP Inc.*, 767 F. Supp. 3d 912, 924 (N.D. Cal. 2025).

Plaintiff cites *Stewart v. Nextera Energy* and *Becerra v. Bank of America*, among others, as alleged support for his breach of the duty of prudence claim. However, those cases are outside the Fifth Circuit, many involved plan language very different than Section 3.05 here, and several emphasized that plan compliance does not automatically end the analysis. But most important, none of these decisions held that adhering to a discretionary forfeiture clause is *per se* disloyal or imprudent.

In contrast, Peco's authorities (also outside-circuit, but numerous and consistent) dismiss materially indistinguishable claims where the clear language of the plan granted the same discretion afforded Peco under both Section 3.05 of the Plan and the SPD. The Court should follow that better-reasoned approach and give effect to the unambiguous terms of these documents.

**C.     Counts IV–V Fail: The Alleged "Prohibited Transactions" (§1106(a) & (b)) Do Not Exist Where   Forfeitures Are Used Internally as the Plan Authorizes.**

Plaintiff's Section 1106(a) theory rests on the assertion that using plan-held forfeitures to reduce future employer contributions is a plan transaction "with" or "for the benefit of" the employer. But the alleged conduct is an *internal* plan allocation expressly contemplated by the Plan; no plan asset left the Plan, no exchange occurred with an external counterparty, and no value transfer occurred outside the Plan trust. Courts addressing this precise theory have dismissed Section 1106 claims for lack of a qualifying "transaction." *See, e.g., McManus v. Clorox Co.*, 2024 WL 4944363 (N.D. Cal. Nov. 1, 2024) (dismissing all six of plaintiffs' claims, including prohibited transaction and anti-inurement claims because (1) use of forfeited contributions to offset future employer contributions does not constitute "transaction" under ERISA, and (2) plaintiffs failed to show defendant received more than *indirect* benefit).

When a fiduciary follows the options the Plan expressly authorizes, that is not the same as using plan assets for personal gain. Plaintiff confuses two very different things: (i) routine, plan-level accounting carried out under a discretionary framework, and (ii) the kind of conflicted, self-interested transactions that Section 1106(b) actually prohibits. Plaintiff has presented no plausible facts that establish that Peco somehow used possession or control to siphon assets away from the Plan. The forfeitures remained Plan assets, and Peco applied them to plan-permitted purposes.

Plaintiff cites *Cunningham v. Cornell Univ.*, 145 S. Ct. 1020 (2025), for the unremarkable proposition that Section 1106 claims need only plausibly allege the statutory elements. But *Cunningham* does not redefine what constitutes a "transaction," "use," or "deal[ing]" within Section 1106, nor does it convert every internal allocation authorized by plan documents into a *per se* prohibited transaction.

Moreover, Plaintiff's reading of *Cunningham* is overbroad. The Supreme Court held only that plausible allegations fitting the statutory elements of Section 1106 could survive dismissal. Importantly, the Court did *not* hold that every internal allocation of plan assets constitutes a prohibited transaction. Here, Plaintiff has not alleged a transfer or exchange with a party in interest; the alleged conduct is nothing more than internal plan administration authorized by the governing documents.

**D.    Plaintiff Cannot Distinguish *Thole* Based on Plan Type.**

Plaintiff's effort to sidestep *Thole v. U.S. Bank N.A.*, 590 U.S. 538 (2020), by pointing out that it involved a defined benefit plan is unavailing. The Supreme Court in *Thole* did not limit its reasoning to defined benefit plans; it reaffirmed the broader constitutional principle that Article III standing requires a concrete and particularized injury, not merely a statutory or generalized

grievance. *Id.* at 540. That requirement applies equally to defined contribution plans. As one district court in this Circuit has recognized:

> *Thole* addressed defined-*benefit* plans (rather than a defined-*contribution* plan, as here), but its reasoning holds true. Consistent with Article III, it determined that "in order to claim the interests of others, the litigants themselves still must have suffered an injury in fact ...." Ibid. (quotation omitted). And it traced this through to other contexts requiring plaintiffs filing suit on others' behalf to show an "independent" injury and "concrete stake" in the controversy. Ibid

*McWhorter v. Service Corp. Int'l*, 748 F. Supp. 3d 459, 469 (S. D. Tex. 2024). *See also In re Omnicom ERISA Lit.*, No. 20-cv-04141 (CM), 2021 WL 3292487, at *6-10 (S.D.N.Y. Aug. 2, 2021) (examining standing of participant in defined-contribution plan to bring ERISA claims).

Here, Plaintiff alleges that his individual account was injured because but for Defendants' use of forfeitures to pay expenses and reduce contributions, those amounts would have been reallocated to participants' accounts, including Plaintiff's. Such an allegation fails to confer Article III standing because it is not a factual allegation of *actual loss* to Plaintiff's account. To the contrary, it is simply a hypothetical claim that his balance might have been higher under a different forfeiture policy. Standing requires a concrete, particularized injury—not speculation about what *might* have been if the Plan were written differently. *See Thole,* 590 U.S. at 540.

## IV. CONCLUSION

Plaintiff's Complaint rests on a flawed premise—that the Plan mandates forfeitures be exhausted on expenses before any other use. Both the Plan and the SPD say otherwise, making it clear that forfeitures **may** be applied to expenses, contributions, **or** reallocations at the administrator's discretion. ERISA requires courts to enforce written plan terms, not to revise them in hindsight.

Because Plaintiff's claims depend on rewriting "may" into "must," each cause of action fails as a matter of law. The administrator acted within the discretionary authority expressly granted by the Plan, and Plaintiff cannot prevail on fiduciary-breach or prohibited-transaction theories based on a mere disagreement with the administrator's discretionary authority. Moreover, Plaintiff has not alleged any cognizable Article III injury, let alone any viable ERISA violation.

For these reasons, and consistent with the growing consensus of federal courts rejecting nearly identical forfeiture theories, this Court should dismiss the Complaint in its entirety, with prejudice.

Dated: September 9, 2025.

Respectfully submitted,

**PECO FOODS, INC.**

By: */s/ Stephen J. Carmody*
  One of Its Attorneys

OF COUNSEL:

Stephen J. Carmody, MSB #8345
scarmody@brunini.com
M. Patrick McDowell, MSB #9746
pmcdowell@brunini.com
R. Richard Cirilli, Jr., MSB #99132
rcirilli@brunini.com
BRUNINI, GRANTHAM, GROWER & HEWES, PLLC
Post Office Drawer 119
Jackson, MS  39205
Phone: 601-948-3101

## **CERTIFICATE OF SERVICE**

  I hereby certify that I have electronically filed the foregoing with the Clerk of this Court using the ECF system, which sent notification of such filing to all registered users.

  Dated:  September 9, 2025.

               */s/ Stephen J. Carmody*
               Stephen J. Carmody